IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JANE DOE, next friend of John Doe, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 4:18-CV-01637 JAR |
| ) | |
| LADUE HORTON WATKINS ) | |
| HIGH SCHOOL, et al., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM AND ORDER**

This matter is before this Court on Motion for Temporary Restraining Order ("TRO") filed by Plaintiff Jane Doe, next friend of John Doe. (Doc. 5.) Upon review of Plaintiff's Complaint (Doc. 1), her Motion, Defendants' Memorandum in Opposition (Doc. 13), Plaintiff's Reply (Doc. 17), the attendant attachments and exhibits, and the parties' oral arguments at the September 28, 2018, hearing, the Court will deny the motion.

**BACKGROUND**

John Doe is a junior at Ladue Horton Watkins High School ("LHS") in the St. Louis suburb of Ladue, Missouri. (Doc. 1 at 3.) As a sophomore, Doe played for the LHS junior varsity ("JV") soccer team, netting five goals and assisting on two more. (*Id*.) Ahead of the 2018 school year, Doe attended tryouts in the hope of securing a spot on the LHS varsity team. (*Id*.) LHS fields three boys' teams: Varsity; JV; and the "C Team," which is essentially a

freshman squad.  LHS Head Soccer Coach Dave Aronberg[1] testified that some ninety students tried out.

John Doe was one of eight juniors not selected for any of LHS's three soccer teams. Upon learning that Doe had been cut, his stepfather asked Coach Aronberg why Doe hadn't made the varsity team.  (Doc. 5-12.)  The coach emailed to explain that, despite Doe's apparent skill and coachability, he was "on the bubble" of making varsity due to "a few holes in his game . . . that put him behind a number of kids."  (*Id*.)  "In the end," Coach Aronberg concluded, "there were just too many kids who had a little better soccer skill and soccer IQ for him to make the team."  (*Id*.)  The stepfather then asked why Doe could not play on the JV team.  (*Id*.) According to the stepfather, Coach Aronberg told him that the program had a policy of not putting juniors on the JV team. (Doc. 5-2 at ¶ 18.)  Doe's stepfather asserts that Coach Aronberg explained that this rule was due to the prior year, when four juniors were placed on the JV team but saw very little game time and, in response, their parents complained to the coaching staff. (*Id*. at ¶ 20.)

Believing that Coach Aronberg's policy of  excluding juniors amounted to improper agebased discrimination (as well as gender-based discrimination because the girls team does not have such a policy), Doe's stepfather wrote to the Ladue School District Board and advised them that Coach Aronberg's policy was illegal.  (*Id*. at ¶¶ 27-28.)  Thereafter, he met with LHS's principal and administrative director.  (*Id*. at ¶ 29.)  In the meantime, the District opened a formal investigation into the alleged discrimination.  (*Id*. at ¶ 39.)  The District ultimately found no evidence of a discriminatory policy and refused the request for relief.  (*Id*. at ¶ 48.)  The District

---

[1] Coach Aronberg testified that he had been coaching soccer at LHS for fourteen years and had served as the head boys' coach for the last five.  He also serves as the head coach for the girls' team.

2

noted that the coaching staff's decision to cut the eight juniors who did not make varsity was based on their belief that rostering that junior, even on the JV team, "was not best for the competitive development of the players or the program." (*Id.*) Doe's stepfather appealed the District's decision. (*Id.* at ¶ 81.) The Ladue School District Superintendent affirmed. (Doc. 5-6.) Thereafter, Doe's mother, Jane Doe, filed suit in this Court, alleging age-based discrimination in violation of the Age Discrimination Act ("ADA"), 42 U.S.C. § 6101 *et seq.*, gender-based discrimination in violation of Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681, and violations of the District's own policies against discrimiantion. (Doc. 1.) Plaintiff named LHS, the Ladue School District, and the seven members of the Ladue Board of Education. The next day, Jane Doe moved the Court to enter a TRO ordering the District to place John Doe on the JV team and to terminate its policy of prohibiting junior boys from playing JV soccer.

The Court set a hearing on Plaintiff's TRO motion and both parties presented oral argument. In addition, Defendants called Coach Aronberg to testify. Coach Aronberg testified that there was no blanket policy of precluding juniors from the JV team. Instead, the coaching staff rostered teams based on a number of individual, external, and practical considerations. At tryouts, Coach Aronberg and his staff evaluated and scored each student on a variety of metrics, such as endurance, passing ability, decision making, and coachability. (Pl. Ex. 21.) Those scores were averaged and the players were ranked. Coach Aronberg testified that, while the rankings were relevant to the selections, there were a number of external factors that affected the final decisions. Chief among those factors, according to Coach Aronberg, were the number of students trying out and each student's ability and opportunity to develop. Coach Aronberg also stated that the JV coach preferred a smaller team and that, in any event, the program simply

could not accommodate every student who tried out due to practical restrictions like the number of uniforms available.  Ultimately, the goal was to fill out the teams' rosters in a manner that maximized the competitiveness of the program by devoting its limited time and resources to the players most likely to be or become significant contributors to the varsity team.  Because freshman and sophomores have more remaining years of eligibility—and therefore greater opportunity to improve—than do juniors, the younger players' development was prioritized.  To that end, Coach Aronberg testified that the same philosophy and evaluation dictated his decision making for the girls' program.

Coach Aronberg testified that he was being sincere when he wrote that Doe was "on the bubble" of making varsity, even after he testified that Doe lacked the skill to start for JV.  When the Court asked Coach Aronberg to explain how Doe could simultaneously be "on the bubble" of making varsity but not good enough to start for JV, the coach explained that the JV team was a developmental squad designed to provide the maximum amount of practice and playing time for players who were likely to play varsity in future years.  With this in mind, the coaching staff routinely placed on JV players who have the skill to play varsity but were unlikely to start, opting to give those players significant playing time with the JV team as opposed to offering them a reserve role on the varsity team.  As a result, Coach Aronberg testified, the JV team included enough higher-skilled players such that Doe was unlikely to see significant playing time, even on JV.  In other words, Doe was "on the bubble" of making a reserve role on the varsity team and, once he missed that cut, he did not have a viable opportunity to meaningfully contribute to the LHS soccer program, even as a member of the JV team.  Coach Aronberg testified that placing Doe on the JV team would have a detrimental effect on the development of the higher-skilled players insofar as doing so would reduce the amount of practice and playing

time those players received.

## ANALYSIS

The Court must consider the following factors when deciding whether to grant a temporary restraining order: (1) threat of irreparable harm to Doe if a temporary restraining order is not granted; (2) whether the threatened harm to Doe outweighs any harm that granting the injunction will inflict on Defendants; (3) whether Doe has shown a likelihood of success on the merits; and (4) whether granting a temporary restraining order is in the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981); Fed. R. Civ. P. 65.

   *a. Irreparable Harm*

"In order to demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Iowa Utilities Bd. v. F.C.C.*, 109 F.3d 418, 425 (8th Cir. 1996) (citation omitted). The "failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 893 (8th Cir. 2013) (quoting *Watkins Inc. v. Lewis,* 346 F.3d 841, 844 (8th Cir. 2003)). Plaintiff argues that Doe will suffer irreparable harm if this case is not decided before the end of the JV soccer season. (Doc. 5 at 8.) Specifically, Doe's stepfather asserts that Coach Aronberg told him that if Doe did not play JV this year, he "has very little chance of making Varsity next year." (*Id.*) At the hearing, Coach Aronberg denied having said this.

Defendants argue that Doe will suffer no harm because he has no legal right to participate in high school sports. (Doc. 13 at 4-5.) Moreover, Defendants note that Missouri State High School Activities Association ("MSHAA") rules require a student-athlete to participate in a minimum number of practices before he or she is eligible to play in a game and that, given the

5

JV soccer team's schedule, Doe could not reach this threshold until just before the final game of the season. (*Id.* at 4.) Such a small loss of participation is not sufficient to justify entering a TRO, Defendants argue. Plaintiff responds that Doe could be given an exemption by MSHAA.

The Court agrees with Defendants. Courts have long held that "[p]articipation in interscholastic athletics is not a property right but a privilege." *State ex rel. Missouri State High Sch. Activities Ass'n v. Schoenlaub*, 507 S.W.2d 354, 359 (Mo. 1974). Accordingly, Doe suffers no legal harm by being excluded from the JV team, much less an irreparable harm. To the extent Plaintiff argues that being excluded from playing in JV games harms Doe's chances of making the 2019 varsity team, the Court is not convinced that putting him on the JV roster by court order would significantly improve his prospects. As an initial point, even if the Court granted Plaintiff's requested relief,[2] Doe would be eligible to play in fewer than half of the season's games and possibly only one. The small number of remaining games reduces the developmental value of participating on the JV team. Second, the Court will in no event order the LHS coaching staff to *play* Doe in whatever games he might be eligible. The Court is reluctant to ever involve itself in such coaching decisions and would not do so absent a much more severe injury and much stronger evidence than is involved in this case. Thus, Doe's requested relief likely fails to address his most significant alleged harm—decreasing his chances of making varsity by losing a year of development—which harm is, in any event, insufficient to justify a TRO. The threat of irreparable harm weighs against Plaintiff.

b. *Balance of Harms*

On the other hand, forcing the District to roster Doe would have a significant negative

---

[2] The Court notes that Plaintiff's requested relief—to order the District to put Doe on the JV team—is likely beyond its ability. At most, the Court could enjoin the District from enforcing the policy and direct Coach Aronberg to review his roster decisions.

impact on Defendants by undermining the soccer program's legitimate philosophy of prioritizing the development of players with more years of eligibility and involving the Court in any of the District's innumerable other extracurricular activities. Likewise, the Court agrees that granting a TRO in this case would invite future motions.

While the Court recognizes the important role equitable relief plays in the protection of students' civil rights, it is hesitant to use that power except in the most extraordinary circumstances. *See Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) ("A preliminary injunction is an extraordinary remedy."). Plaintiff's argument that one player's participation on the JV team would not significantly impact the other players' opportunity and development is not unreasonable, but the Court is sympathetic to Defendants' argument that granting a TRO in this case could result in an increase of similar requests going forward. In any event, the Court will not second-guess the coaching staff's determination as to what will and will not affect their players' development. The balance of harms therefore weighs in favor of Defendants.

    *c. Public Interest*

The Court will skip ahead and briefly discuss the final *Dataphase* factor because it is closely related to the threat and balance of harms. For many of the reasons already discussed, the Court finds that involving itself in Doe's case would be contrary to the public interest. The public certainly has an interest in the fair and successful operation of high school activities, as well as in identifying and eliminating discrimination on the basis of age or gender. However, involving a federal court in a soccer program's coaching decisions as to an individual student-athlete will rarely advance either interest.

The Court reiterates that Doe's mother and stepfather's advocacy on behalf of their son is admirable, and, as it did on several occasions at the hearing, commends them. Nevertheless, the

Court does not believe that John Doe's case warrants its involvement, and therefore concludes that the public interest favors Defendants.

    d.  *Likelihood of Success on the Merits*

        i.  <u>ADA</u>

Plaintiff's ADA claim is unlikely to succeed for several reasons. Under the ADA, "no person in the United States shall, on the basis of age, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any program or activity receiving Federal financial assistance." 42 U.S.C. § 6102. As an initial matter, plaintiffs seeking injunctive relief under the ADA must provide notify the Secretary of Health and Human Services and the Attorney General of the United States at least thirty days prior to filing suit. 42 U.S.C. § 6104(e)(1). Defendants argue that Plaintiff's failure to provide the required notice deprives the Court of jurisdiction. (Doc. 13 at 8-9 (citing *Wieker v. Mesa Cty. Valley Sch. Dist. #51*, No. CIVA05CV806-WYD-CBS, 2007 WL 595629, at *9 (D. Colo. Feb. 21, 2007)).) In addition, Defendants argue that Plaintiff has failed to exhaust her administrative remedies. (*Id.* (citing 42 U.S.C. § 6104(e)(2), (f); 45 C.F.R. § 90.50).)

    Plaintiff does not address the notice requirement in her response, but asserts that the Eighth Circuit recognizes an exception to the exhaustion requirement under certain circumstances. (Doc. 17 at 7-8 (citing *Schoolcraft v. Sullivan*, 971 F.2d 81, 86 (8th Cir. 1992)).) The Court notes that the exception requires a showing that compelling exhaustion would cause irreparable harm. *Schoolcraft*, 971 F.2d at 85, 86. Because, as discussed above, there is no legal right to participation in high school sports, Doe will not be harmed by exhausting his administrative remedies. Accordingly, Plaintiff has failed to show that she is excused from the exhaustion requirement, and her ADA claim therefore may be subject to dismissal.

Secondly, although the Court recognizes that students in a given school grade will naturally hew to the same small range of ages, it concludes that a junior-grade-based policy would not be unconstitutional, even if it existed. Under Code of Federal Regulations § 110.3, "[a]ge-related term means a word or words that necessarily imply a particular age or range of ages (e.g., 'children,' 'adult,' 'older persons,' but not 'student' or 'grade')." Thus a district policy precluding juniors—or any other grade—from participating in a program or service would not support an ADA claim. Even if grade were a legitimate proxy for age, taking into account a player's grade level—and therefore his remaining years of eligibility—"bears a direct and substantial relationship" and is "necessary" to the normal operation of developing and maintaining a successful soccer program. *See* 34 C.F.R. § 110.12, .13.

Third, the Court is not convinced that the District even has a policy of excluding juniors from the JV team. Of significant note, Coach Aronberg testified that no such policy exists. Indeed, juniors have participated on the JV team in years past. Likewise, the coach outlined the reasons that placing juniors on the JV team would not be beneficial to those students and would be detrimental to the program, reasons such as maximizing opportunity and practice time for the players most likely to contribute to the future success of the varsity program. Coach Aronberg also clarified his reasons for cutting John Doe. Although Doe's stepfather stated in his declaration that he was given numerous changing explanations, Coach Aronberg made it clear that, notwithstanding Doe's considerable skill and potential, Doe was not in a position to meaningfully contribute to the overall success of the program this year. The Court finds Coach Aronberg's testimony persuasive.

For all of these reasons, the Court concludes that Plaintiff's likelihood of success on the merits is small.

      ii.    Title IX

Plaintiff's Title IX claim is also unlikely to succeed. Under Title IX, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681. Once again, the Court finds Coach Aronberg's testimony persuasive. Coach Aronberg, who is the head coach of both the boy's and the girl's teams, testified that he used the exact same evaluation criteria and selection method for both teams. The only difference the coach noted was that there are only two girls' teams. Put simply, the Court sees no evidence of gender-based discrimination in the way LHS's soccer program is run.[3] Indeed, the Court notes that juniors have, on occasion, played on both the boys' and girls' teams in the last seven years. That this has happened more often for the girls' team only bolsters Coach Aronberg's explanation that the number of students trying out—which is substantially higher for the boys—has a significant effect on the rostering of junior boys.

      iii.    District Policies

Last, Plaintiff argues that the exclusion of junior boys from the JV soccer team violates the District's internal policies against discrimination. The Court concludes that this claim is unlikely to succeed because, among the other reasons stated above in addressing Plaintiff's ADA and Title IX claims, the District's policies do not create a right to participate in sports and the Court does not believe juniors boys are being excluded from the JV soccer team on the basis of age or gender.

## **CONCLUSION**

---

[3] The Court once again notes that because participation in high school sports is not a legal right, Plaintiff cannot maintain a Title IX claim even in the presence of overt gender-based discrimination.

10

The Court concludes that the *Dataphase* factors weigh against the issuance of a TRO. Notably, Doe lacks a legal interest in participation, the evidence suggests that there is no policy of excluding juniors, and Plaintiff is unlikely to succeed on the merits.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff Jane Doe's, next fried of John Doe, Motion for Temporary Restraining Order (Doc. 5), is **DENIED**.

Dated this 1st day of October, 2018, at 4:00 p.m.

*[signature]*
**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**